[861 NE2d 43, 828 NYS2d 228]

HAROLD ROSENBAUM, Respondent, v CITY OF NEW YORK et al., Appellants.

Argued October 12, 2006; decided November 20, 2006

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel,* New York City (*Deborah A. Brenner, Leonard Koerner* and *Larry A. Sonnenshein* of counsel), for appellants. I. Because the August 18, 1994 letter did not place the City of New York on notice of the slander of title claim so as to enable it to conduct a timely investigation with an eye toward imminent litigation, the First Department erred in construing it as a valid notice of claim. (*Young v New York City Health & Hosps. Corp.,* 91 NY2d 291; *Gaynor v Town of Hoosick,* 58 NY2d 699; *Adkins v City of New York,* 43 NY2d 346; *Matter of Beary v City of Rye,* 44 NY2d 398; *Lomax v New York City Health & Hosps. Corp.,* 262 AD2d 2; *Salesian Socy. v Village of Ellenville,* 41 NY2d 521; *Kriger v Industrial Rehabilitation Corp.,* 8 AD2d 29, 7 NY2d 958; *Squire Records v Vanguard Rec. Socy.,* 19 NY2d 797; *Berner v City of New York,* 276 App Div 1069; *McKune v City of New York,* 19 AD3d 308.) II. The First Department also erred in holding an attorney for a discrete city agency to be an attorney regularly engaged in representing the City of New York within the meaning of the General Municipal Law § 50-e (3) (a). (*Matter of Iannelli v Lev-*

*enthal,* 79 AD2d 562; *Adkins v City of New York,* 43 NY2d 346; *Losada v Liberty Lines Tr.,* 155 AD2d 337; *Herrera v Duncan,* 13 AD3d 485; *Gallagher v Liberty Lines Tr.,* 211 AD2d 440; *Matter of Brown v Board of Trustees of Town of Hamptonburg, School Dist. No. 4,* 303 NY 484; *Teresta v City of New York,* 304 NY 440; *Matter of Board of Educ. of Enlarged Ogdensburg City School Dist. [Wager Constr. Corp.],* 37 NY2d 283; *Davidson v Bronx Mun. Hosp.,* 64 NY2d 59; *Kroin v City of New York,* 210 AD2d 95.) III. The complaint was also fatally deficient in that it failed to allege that a timely notice of claim had been served upon the City of New York. (*Telaro v Telaro,* 25 NY2d 433; *Scantlebury v New York City Health & Hosps. Corp.,* 4 NY3d 606; *Smith v Scott,* 294 AD2d 11; *Widger v Central School Dist. No. 1,* 20 AD2d 296; *Republic of Argentina v City of New York,* 25 NY2d 252; *Copeland v Salomon,* 56 NY2d 222; *Salesian Socy. v Village of Ellenville,* 41 NY2d 521.) IV. Because a slander of title claim does not accrue until plaintiff has suffered pecuniary loss, the August 18, 1994 letter was premature and therefore could not serve as a notice of claim. (*Snyder v Town Insulation,* 81 NY2d 429; *IFD Constr. Corp. v Corddry Carpenter Dietz & Zack,* 253 AD2d 89; *39 Coll. Point Corp. v Transpac Capital Corp.,* 27 AD3d 454; *Iuliano v Romano,* 225 AD2d 493; *Kendall v Stone,* 5 NY 14; *Terrace Hotel Co. v State of New York,* 19 NY2d 526; *Collision Plan Unlimited v Bankers Trust Co.,* 63 NY2d 827; *Drug Research Corp. v Curtis Publ. Co.,* 7 NY2d 435; *Squire Records v Vanguard Rec. Socy.,* 19 NY2d 797; *Hanbidge v Hunt,* 183 AD2d 700.)

*Derfner & Gillett, LLP,* New York City (*Donald A. Derfner* and *David P. Gillett* of counsel), for respondent. I. The Appellate Division correctly held that the August 18, 1994 letter was a notice of claim. (*Abbot v City of New York,* 271 AD2d 364; *Basile v City of New York,* 156 AD2d 239; *Montana v Incorporated Vil. of Lynbrook,* 23 AD2d 585; *Melisi v Central School Dist. No. 1,* 25 AD2d 54; *Mahoney v Town of Oyster Bay,* 71 AD2d 879; *Brown v City of New York,* 95 NY2d 389; *Losada v Liberty Lines Tr.,* 155 AD2d 337; *Gallagher v Liberty Lines Tr.,* 211 AD2d 440; *Santiago v Liberty Lines Tr.,* 259 AD2d 362; *Miller v Liberty Lines,* 208 AD2d 454.) II. Harold Rosenbaum's slander of title cause of action accrued the moment the Department of Housing Preservation and Development filed the false liens, and his special damages are not limited to the lost sale. (*Ferran v Belawa,* 241 AD2d 841; *Lampert v Edelman,* 24 AD2d 562; *Republic of Argentina v City of New York,* 25 NY2d 252; *Hanbidge v Hunt,* 183 AD2d 700; *Kirkland v American Tit. Ins. Co.,* 692 F

Supp 153; *Memory's Garden v D'Amico*, 84 AD2d 892; *Liberman v Gelstein*, 80 NY2d 429; *Hogan v Herald Co.*, 84 AD2d 470, 58 NY2d 630; *Bishop v New York Times Co.*, 233 NY 446; *People v Evans*, 94 NY2d 499.) III. Failure to allege timely service of the notice of claim in the complaint is not fatal to Harold Rosenbaum's cause of action. (*Rosenbaum v City of New York*, 5 AD3d 154; *Salesian Socy. v Village of Ellenville*, 41 NY2d 521; *Snyder v Board of Educ. of Ramapo Cent. School Dist. No. 2, Town of Ramapo, Rockland County*, 42 AD2d 912; *Cochrane v Town of Gates*, 18 AD2d 1048; *Murray v City of New York*, 43 NY2d 400; *Fitzgibbon v County of Nassau*, 112 AD2d 266; *Scantlebury v New York City Health & Hosps. Corp.*, 4 NY3d 606; *Davidson v Bronx Mun. Hosp.*, 64 NY2d 59; *Smith v Scott*, 294 AD2d 11; *Widger v Central School Dist. No. 1*, 20 AD2d 296.)

**OPINION OF THE COURT**

READ, J.

On this appeal, we are asked to decide whether a letter dated August 18, 1994 sent by the attorney for plaintiff Harold Rosenbaum to an attorney in the New York City Department of Housing Preservation and Development (HPD) satisfies General Municipal Law § 50-e. For the reasons that follow, we conclude that it does not.

I.

On August 31, 1993, plaintiff purchased 31-33 Mt. Hope Place, a 26-unit residential apartment building in the Bronx, from a trustee in bankruptcy. The purchase price was $5,000. On November 10, 1993, plaintiff and the City of New York executed an in rem installment agreement whereby plaintiff agreed to pay the City $66,298.39[1]—$34,184 upon execution of the agreement and the balance in four quarterly installments commencing on January 1, 1994—representing all delinquent taxes, assessments and other legal charges and interest due on the building, computed to the date of the agreement.

In May 1991, however, Civil Court found that a dangerous condition existed at the building, and appointed an administrator pursuant to RPAPL article 7-A to oversee necessary repairs. The 7-A administrator borrowed $160,000 from HPD to pay for this work. The repairs were completed by February 1993, several months before plaintiff purchased the building.

---

1. This is the figure set forth by plaintiff in his complaint. Other similar but slightly different numbers—notably, $64,000—appear at various points in the record.

By March 1994, several months after plaintiff bought the building and entered into the in rem installment agreement, he and HPD were wrangling over whether the City should or could create enforceable liens for the $160,000 loaned by HPD. On March 16, 1994, an HPD attorney in the agency's Judgment Enforcement Unit wrote plaintiff, via ordinary and certified mail, return receipt requested, to advise that he had not yet received apparently promised documents showing "that various HPD liens were somehow extinguished by [plaintiff's] purchase of the property"; and to warn that unless these documents were forwarded within 10 days, HPD would "commence enforcement of said liens."

On March 25, 1994, plaintiff replied that his attorney had told him that he had spoken to the HPD attorney, who had agreed to forward "documents that purportedly will show why the City believes it is entitled to place a lien on these premises," but that such papers had not been received. He expressed his understanding that

> "the foreclosure of the mortgage, which pre-dates your alleged lien, wipes out your non-filed liens. In addition, the Bankruptcy Court approved the sale to me and when I bought, there [were] no such liens on file. Accordingly, [HPD's] negligence in not properly filing the liens cannot work to prejudice me."

He warned that he had "been informed that the continuation of the false liens is a slander on my title and is actionable"; and copied this letter to his attorney.

Also on March 25, 1994, the attorney representing the 7-A administrator notified HPD that a March 21, 1994 affidavit of expenses, which totaled $160,000, should have been sent to plaintiff rather than to him. He further suggested "that there was a superceding foreclosure and that, apparently, these alleged charges were not properly filed," and blind-copied his letter to plaintiff. On May 28, 1994, however, HPD filed a statement of account for the $160,000 in the office of the city collector.

On August 12, 1994, plaintiff's attorney wrote a second attorney at HPD—that is, not the same agency counsel to whom he and his client had talked or written the previous spring—stating that "[t]he subject of this letter is the liens for work allegedly performed . . . as set forth in the affidavit of" expenses

dated March 21, 1994. He noted that "[a] tax search was done 7/21/94 in connection with a title application for the sale of the building," which revealed three liens totaling $160,000. Plaintiff's attorney asserted that when plaintiff purchased the building he did not know that $160,000 had been spent on repairs, or that the City intended to impose liens in this amount. He declared that "[t]he purpose of this letter is to request that these liens be canceled of record," and closed with the request that the HPD attorney "[p]lease contact [him] after [he had] reviewed the matter."

Six days later, on August 18, 1994, plaintiff's attorney wrote the HPD attorney again. After outlining plaintiff's and his prior dealings and dispute with HPD, plaintiff's attorney complained that the "sole notice" relative to the $160,000 was the March 21, 1994 affidavit of expenses. Indeed,

> "[t]o date no bill was ever sent to the record owner. The sole awareness was a new title search relative to a sale that indicate[s] that these charges were placed as financial aid[ ] liens on May 28, 1994 (see copy of tax search attached).

> "Clearly there is no legal basis for these liens. I explained this to you and to date no one has provided any reason for the City's failure to follow the law and yet to slander [plaintiff's] title by placing these liens on the property almost one year after title passed.

> "Unless these liens are removed forthwith then [the owner] may lose his current sale and be substantially damaged. If an action is brought due to [the] City's unlawful refusal to remove the illegal liens, then the owner is entitled not only to costs but legal fees as well. I hope this will not be necessary.

> "Please review and reply."

On October 14, 1994, plaintiff and his attorney met with HPD representatives, including both of the HPD attorneys with whom they had dealt previously. Plaintiff's attorney followed up this meeting with a letter to the HPD attorney whom he had written in August "to confirm the City's position with respect to these alleged liens." After setting forth his understanding of the City's view in 11 numbered paragraphs, he stated that

> "[i]f after you have reviewed this and the law, you

still do not vacate these clearly improper and unenforceable liens from this property on or before 10/18/94, then I will have no choice but to direct my client to commence an action not only to discharge same, but for all damages, including counsel fees and punitive damages for the City's punitive refusal to comply with the law.

"Be guided accordingly."

Plaintiff sued the City on October 21, 1994. The first cause of action sought to discharge the liens; the second alleged slander of title, "caus[ing] a loss of a sale and resultant profit to plaintiff, attorneys['] fees and costs" believed to exceed $500,000. The complaint did not allege special damages.

On January 16, 1995, plaintiff served a notice of claim on the Comptroller of the City of New York.[2] The notice specified the "nature of the claim" as inclusion of plaintiff's building in an in rem tax foreclosure action "when there were no taxes or other charges legally due," which was brought about by the failure of city employees "to properly file, docket and bill for alleged work done on the premises and [who] are now precluded from doing so as claimant was a bona fide purchaser who purchased with no notice nor record notice of these alleged liens." Plaintiff further stated that his claim arose on December 16, 1994 and was continuing, and that he had been damaged in the amount of $500,000. Plaintiff's property had apparently remained on the list (called the list of delinquent taxes) of parcels on which there were tax liens subject to foreclosure (*see generally* Administrative Code of City of NY § 11-405). On December 16, 1994, the City commenced an in rem tax foreclosure proceeding, which was withdrawn five months later on May 19, 1995 (*see id.* § 11-413).

In 1998, plaintiff moved for partial summary judgment to discharge the 7-A liens, and the City subsequently cross-moved for summary judgment dismissing the complaint. Supreme Court granted plaintiff's motion, denied the City's cross motion and severed the second cause of action for slander of title. The Appellate Division modified Supreme Court's order to the extent of denying plaintiff's motion for partial summary judgment, and

**2.** The first page of the copy of the notice of claim in the record is undecipherable. The parties most often assign the date of January 16, 1995 to this document, but on occasion refer to it as dated January 6, 1995 or January 9, 1995.

subsequently certified to us the question whether its order was properly made.

The appeal "turn[ed] on how and when a 7-A lien [was] created and when a purchaser [was] put on notice of the forthcoming lien" (*Rosenbaum v City of New York*, 96 NY2d 468, 473 [2001]). We concluded that the lien was created when HPD filed a statement of account in the office of the city collector, as required by section 27-2144 (b) of the New York City Administrative Code; and that to take priority over other liens and encumbrances, HPD must have previously filed the purchase or work orders reflected in the statement of account in a building-specific index, as required by section 27-2144 (a). These indices "furnish[ ] notice to prospective purchasers and lenders that public monies have been spent and a lien is forthcoming. If HPD fails to furnish this notice, the forthcoming lien cannot be enforced retroactively against them provided they took in 'good faith' " (96 NY2d at 473-474 [citation omitted]).

In this case, the City admittedly neglected to file the relevant purchase or work orders in a timely fashion; therefore, plaintiff did not have constructive notice of any impending 7-A liens when he purchased the building. Because the City failed to raise a triable issue of fact as to plaintiff's actual notice, we did not address whether he would have been subject to the lien had he actually known about the loans. Thus, we reversed the Appellate Division's order, granted plaintiff partial summary judgment on his first cause of action discharging the liens, and answered the certified question in the negative.

Our decision had the effect, of course, of returning the second cause of action for slander of title to Supreme Court for trial. Plaintiff filed a note of issue and both parties moved for summary judgment. In 2002, Supreme Court denied the motions, finding issues of fact as to whether the City acted with malice and plaintiff suffered special damages, and the Appellate Division subsequently affirmed. While plaintiff had not pleaded special damages, the Appellate Division concluded that this defect was remedied in an affidavit offering evidence of a lost sale at a price of $525,000. The City, for its part, contended that the building eventually sold for far more.

On April 26, 2004, the City moved to dismiss the action on the ground that plaintiff had not complied with the notice-of-claim requirements in the General Municipal Law, and thus had not satisfied a condition precedent to any action against it in

tort. The City argued that the January 16, 1995 notice of claim was directed at the subsequently withdrawn December 16, 1994 in rem tax foreclosure proceeding rather than the 7-A liens, and, in any event, was improperly filed after rather than before plaintiff brought suit on October 21, 1994; that the limitation period during which plaintiff might have sought permission to file late notice had lapsed; and that an action for slander of title arises upon the loss of a prospective sale, which plaintiff's complaint alleges to have occurred before October 21, 1994. In response, plaintiff scolded the City for "attempt[ing] . . . to delay the day of reckoning in this decade old lawsuit," and interposing a "procedural device" to "keep [him] from putting [his] case before a jury." He annexed exhibits to his affidavit, including the August 18, 1994 letter, which he labeled a "Notice of Claim Letter"; and the January 16, 1995 notice of claim, which he labeled a "Supplemental Notice of Claim."

Supreme Court granted the City's motion and dismissed the complaint. Citing *Hanbidge v Hunt* (183 AD2d 700 [2d Dept 1992]), Supreme Court concluded that plaintiff's tort claim "did not arise until he actually lost a sale of his property and suffered damages as a result." But in this case, plaintiff did not present the City with information about any lost sale until 2002, in an affidavit that he submitted in conjunction with the parties' competing motions for summary judgment on the cause of action for slander of title. The affiant "stated that he had an agreement with plaintiff to purchase the subject building in 1994, but due to the liens filed, the sale could not be concluded"; however, he also "stated that he agreed to wait while plaintiff brought [this] action, but that he 'went with other deals' after a year had passed." The court commented that even with this belated affidavit, ascertaining whether the claim arose on July 21, 1994, when a tax search carried out in connection with this potential purchase revealed the liens, or perhaps as late as a year afterwards was "an exercise in speculation." In addition, the court concluded that plaintiff's letters to HPD's attorneys were not served on a proper party, an attorney "regularly engaged in representing [the] public corporation" (General Municipal Law § 50-e [3] [a]), since HPD was an agency within a public corporation, the City of New York, represented by Corporation Counsel.

The Appellate Division, with one Justice writing separately, concluded that plaintiff had, in fact, satisfied his obligation to serve a timely and adequate notice of claim. The Court was

persuaded that the August 18, 1994 letter was sufficient, when considered together with "plaintiff's subsequent meetings with HPD attorneys and the course of the ensuing litigation," and the "specific nature of" a slander of title claim, which was "vital to [the Court's] interpretation and application of the notice of claim statute" (24 AD3d 349, 353 [1st Dept 2005]). That is, HPD "made the underlying loans which are the subject of liens it itself had also created and recorded" so that "the City, through its agency, had access to most of the information it needed to assert its defense to plaintiff's claim for slander of title" (*id.* [citation omitted]). Relatedly, the Appellate Division concluded that the claim arose when plaintiff suffered a "tangible $160,000 diminution in the value of his property at the time the liens were recorded" on May 28, 1994 (*id.* at 356). Finally, the Court reasoned that since HPD is a city agency, its attorneys are "regularly engaged in representing [the] public corporation" within the meaning of General Municipal Law § 50-e (3) (a); therefore, "the mailing of the August 18 letter to the attorney at HPD handling the very liens at issue clearly satisfied the service requirements" (*id.* at 353-354). Accordingly, the Appellate Division reversed Supreme Court's order, but subsequently granted the City leave to appeal, certifying the following question to us: "Was the order of [the Appellate Division], which reversed the order of the Supreme Court, properly made?"

## II.

General Municipal Law § 50-e (2) requires written notice, "sworn to by or on behalf of the claimant," which sets forth "the name and post-office address of each claimant, and of his attorney, if any," "the nature of the claim," "the time when, the place where and the manner in which the claim arose" and "the items of damage or injuries claimed to have been sustained so far as then practicable." As we have explained,

> "[t]he test of the sufficiency of a Notice of Claim is merely whether it includes information sufficient to enable the city to investigate . . . . Thus, in determining compliance with the requirements of General Municipal Law § 50-e, courts should focus on the purpose served by a Notice of Claim: whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the [claim]" (*Brown v City*

*of New York*, 95 NY2d 389, 393 [2000] [internal quotation marks and citations omitted]).

Put another way, the "plain purpose" of statutes requiring pre-litigation notice to municipalities "is to guard them against imposition by requiring notice of the circumstances . . . upon which a claim for damages is made, so that its authorities may be in a position to investigate the facts as to time and place, and decide whether the case is one for settlement or litigation" (*Purdy v City of New York*, 193 NY 521, 523 [1908], *rearg denied* 195 NY 604 [1909]).

In this case, the claim was for special damages. The August 18, 1994 letter, however, was filled with tentative expressions, not "information sufficient to enable the city to investigate" the grounds for an imminent lawsuit seeking special damages (*Brown*, 95 NY2d at 393). After disputing the "legal basis" for the 7-A liens and characterizing them as a slander on claimant's title, plaintiff's attorney stated that "[u]nless these liens are removed forthwith then [the owner] *may lose* his current sale and be substantially damaged" (emphasis added). He observed that *"[i]f an action is brought* due to [the] City's unlawful refusal to remove the illegal liens, then the owner is entitled not only to costs but legal fees as well" (emphasis added), while expressing the *"hope this will not be necessary"* (emphasis added). Further, this was hardly the first written communication between plaintiff and HPD during the course of their months-long negotiations related to the HPD loans, or even the first time that plaintiff mentioned slander of title or hinted that he might sue if HPD did not relent. Plaintiff wrote an HPD attorney on March 25, 1994, with a copy to his attorney, threatening that he had "been informed that the continuation of the false liens is a slander on my title and is actionable." Plaintiff's attorney wrote a different HPD attorney on August 12, 1994 to plead plaintiff's case and request cancellation of the liens. Finally, plaintiff's attorney wrote the HPD attorney again on October 14, 1994, this time delivering an ultimatum with a deadline.

The City argues that the August 18, 1994 letter was unremarkable, "appear[ing] as merely a piece of routine correspondence between plaintiff's counsel and an attorney representing one of the City's many administrative agencies" exchanged during the heat of an ongoing controversy. We agree. The requirements of General Municipal Law § 50-e (2) are not fulfilled when a plaintiff or an attorney writes a letter to a city agency

suggesting that unmet demands might lead to litigation. If they were, the City would be placed in an untenable position since any number of everyday disputes between citizens and city agencies will inevitably yield streams of similar, vaguely threatening correspondence. Section 50-e does not abet notice of claim by stealth.

The August 18, 1994 letter did not specify "the items of damage or injuries claimed to have been sustained" by plaintiff, as required by General Municipal Law § 50-e (2). Special damages are an element of a cause of action for slander of title based upon the recording of an unfounded claim, and the cause of action does not arise until special damages actually result (*Squire Records v Vanguard Rec. Socy.*, 19 NY2d 797 [1967]). This is why the period of limitations begins to run, not from the date of the recording, but from the time when pecuniary loss is incurred (*see* Restatement [Second] of Torts § 633 [1977]; *see also* Annotation, *Recording of Instrument Purporting to Affect Title as Slander of Title*, 39 ALR2d 840, 860-861; *Hanbidge v Hunt*, *supra* [cause of action for slander of title does not arise when a filing falsely restricting easement occurred, unbeknownst to easement holder, but rather upon loss of sale]). Otherwise, the one-year statute of limitations could expire before any cause of action for slander of title even accrues.

"The most usual manner in which a third person's reliance upon disparaging matter causes pecuniary loss is by preventing a sale to a particular purchaser" (Restatement [Second] of Torts § 633, Comment *c*). The only pecuniary loss arguably identified in the August 18, 1994 letter was a potentially thwarted sale. The letter did not, however, furnish the City with information sufficient to investigate this alleged loss. Plaintiff did not reveal the name of the prospective purchaser or the purchase price until eight years later in conjunction with the parties' motions for summary judgment. Even then, as Supreme Court pointed out, plaintiff was vague as to "the time when" (*see* General Municipal Law § 50-e [2]) this sale may have been lost.

In sum, the August 18, 1994 letter was not a valid notice of claim. It did not alert its recipient to the imminence of litigation, or adequately describe special damages or when they were allegedly incurred. Because of our disposition of this appeal, we need not reach and express no opinion on the question of whether, in light of the City Charter's designation of Corporation Counsel as the "attorney and counsel for the city and every agency thereof" who "shall have charge and conduct of all the

law business of the city and its agencies'' (NY City Charter § 394 [a]), an in-house attorney who represents a discrete city agency qualifies as ''an attorney regularly engaged in representing [the] public corporation'' within the meaning of General Municipal Law § 50-e (3) (a), and thus is a proper person upon whom service of a notice of claim against the City may be made.

Accordingly, the order of the Appellate Division should be reversed, with costs; defendants' motion to dismiss the second cause of action in the complaint granted; and the certified question answered in the negative.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, GRAFFEO, SMITH and PIGOTT concur.

Order reversed, etc.