******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# KIMBERLY CHAMERDA ET AL. *v.* JOHN OPIE ET AL.
## (AC 40573)

DiPentima, C. J., and Elgo and Pellegrino, Js.

*Syllabus*

The plaintiff C sought to recover damages from the defendants, O and N, for slander of title in connection with certain property that she had inherited from E. In 1984, O purchased lot 15 from H and W, who had inherited the land from the estate of their father, K. K also had owned two adjacent parcels to the east of lot 15, lots 19 and 23, however, he sold lot 23 to E and her husband, and he divided lot 19, which was located in between lots 15 and 23, along the ridgeline of a building on the property and quitclaimed the eastern part to E. A partnership that K and E had formed operated a business out of the building on lot 19. When K divided lot 19, he also executed a will by which he left his interests in the partnership to E and lot 15, as well as the residue and remainder of his estate, to H and W. Following K's death, his will was admitted to probate and an executor was appointed, who initially issued two certificates of title for lot 19, stating his opinion that E had owned both lot 19 west and lot 19 east, but later included lot 19 west as part of K's estate. The executor never closed the estate. From the time he purchased lot 15 until some point in 2003, O believed that E owned all of lot 19. In 2003, however, a surveyor advised him that nothing existed in the town's land records to prove E's ownership of lot 19 west, and O hired N to investigate. N discovered that lot 19 west remained in K's open estate, opined that it should have been devised to H and W as part of the residue of K's estate, and drafted a quitclaim deed for W to sign that conveyed to O whatever interests she had in lot 19 west. The signed deed was recorded in the land records on April 28, 2005, along with a survey. Thereafter, E died testate, leaving lot 23 and her interests in the partnership to C. In 2008, N filed a motion for a hearing in the Probate Court on behalf of O to determine who was entitled to lot 19 west. The Probate Court denied the motion, and N filed an appeal on behalf of O and W with the trial court, which remanded the matter to the Probate Court for a hearing. Concomitant with the appeal, N recorded a notice of lis pendens on the land records. Following a hearing held in 2011, the Probate Court issued a decision, concluding that lot 19 west belonged to the partnership and that K intended to transfer his interests therein to E as a partnership asset. N then filed an appeal with the trial court on behalf of O, W and the successors in interest to H and her estate, and recorded a second notice of lis pendens. Thereafter, the appeal was withdrawn and releases of the notices of lis pendens were recorded pursuant to an agreement reached by the parties, and, in 2013, C commenced the present action against the defendants for slander of title. Subsequently, the defendants filed separate motions for summary judgment, arguing that the statute of limitations had passed and that the alleged wrongful conduct was absolutely privileged. The trial court denied the motions, and the defendants thereafter filed a joint motion to dismiss for lack of subject matter jurisdiction, which the trial court granted. From the judgment rendered thereon, C appealed to this court. *Held*:

1. The trial court had subject matter jurisdiction over C's slander of title claims, as C had standing to bring those claims and the defendants' actions and statements in preparing and recording the quitclaim deed and survey were not absolutely privileged: C, as a specific devisee of E, had a salable interest in lot 19 west that was adversely affected by the defendants' preparation and recording of the deed and survey, as the law giving rise to the tort of slander of title clearly contemplates a wider range of interests sufficiently cognizable to confer standing, E took title, albeit contested, in lot 19 west immediately upon K's demise and C produced evidence of a potential sale and the difficulty she had in effecting that sale because of the challenged actions; moreover, the preparation and recording of the deed and survey were too remote in time from the probate action to be related thereto and too dissimilar

in nature to the kinds of statements the doctrine of absolute immunity was meant to protect as privileged, as the evidence indicated that the defendants failed to obtain a deed from both H and W, which suggested that they were less concerned about actually obtaining title to lot 19 west than with challenging C's title, that the defendants' actions were undertaken approximately five years prior to the bringing of the probate action and that the deed and survey were recorded for the purpose of obtaining O's standing for some nebulous action that had yet to coalesce until E had died, and although our state statutes expressly permit the use of notices of lis pendens in the manner they were used in this case, our statutes specifically discourage the abuse of the land records for purposes of slandering title, and given the defendants' admissions that the purpose of the deed and survey was to confer on O the ability to call into legal question the validity of E's title after she died, these actions were distinct from the preparation and recording of the notices of lis pendens related to a specific judicial proceeding.

2. The trial court should have granted the defendants' motions for summary judgment because C's slander of title claims were time barred under the applicable three year statute of limitations (§ 52-577): pursuant to § 52-577, the limitations period began to run, as a matter of law, upon the recording of the quitclaim deed and survey on April 28, 2005, which, under the statute, was the occurrence of the act complained of, and, therefore, because C challenged the dismissal of her claims only on the basis of the preparation and recording of the deed and survey, and because the recording thereof was a single occurrence completed some eight years before the commencement of the present action, C's claims were untimely; moreover, there was no merit to C's claim that equity demanded that this court recognize the defendants' actions to be a continuing course of conduct such that the limitations period was tolled until the release of the notices of lis pendens, as O's failure to withdraw the deed and survey was not a continuing breach of a continuing duty because there clearly was no special relationship between the parties and there was no later wrongful conduct related to the alleged prior wrongful acts.

Argued May 24—officially released October 23, 2018

*Procedural History*

Action to recover damages for slander of title, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, *Agati, J.*, denied the defendants' motions for summary judgment; thereafter, the court, *A. Robinson, J.*, granted the defendants' motion to dismiss and rendered judgment thereon, from which the named plaintiff appealed to this court. *Improper form of judgment*; *judgment directed.*

*David L. Weiss*, for the appellant (named plaintiff).

*James E. O'Donnell*, for the appellee (named defendant).

*Nadine M. Pare*, for the appellee (defendant Norbert W. Church, Jr.).

*Opinion*

DiPENTIMA, C. J. The plaintiff Kimberly Chamerda[1] inherited certain real property from her aunt, Elsie Nemeth. The defendant John Opie, who owned an adjacent parcel, hired the defendant Norbert W. Church, Jr., an attorney, to commence a legal challenge to the plaintiff's ownership of part of the property. After that action eventually was withdrawn, the plaintiff brought the present action in the Superior Court against Opie and Church for slander of title. The plaintiff now appeals from the judgment of dismissal for lack of subject matter jurisdiction, claiming that the trial court erred by (1) concluding that the defendants were entitled to absolute or qualified immunity, or both, and (2) failing to apply the law of the case doctrine to bar the defendants from raising the immunity defense in their joint motion to dismiss where they had made nearly identical arguments in earlier motions for summary judgment. In addition to responding to the plaintiff's claims on appeal, the defendants raise an alternative ground on which to affirm the judgment: They claim that the court erred by denying their motions for summary judgment where their actions were privileged or the statute of limitations had run, or both. Although we agree with the plaintiff that the trial court erred in concluding that the challenged actions were absolutely privileged and therefore that it lacked subject matter jurisdiction, we nevertheless agree with the defendants that they were entitled to summary judgment on the statute of limitations ground. Accordingly, the form of the judgment is improper; we reverse the judgment of dismissal and remand the case to the trial court with direction to render judgment in favor of the defendants.

The relevant facts and procedural history are as follows. In 1984, Opie purchased 15 Buena Vista Road in Branford from Beatrice Hull and Ruth Warner, sisters who had inherited that land from the estate of their father, Howard Kelsey. In addition to lot 15, which had been his residence, Kelsey once owned the two adjacent parcels to the east, lots 19 and 23. In 1960, however, Kelsey sold lot 23 to Elsie Nemeth and her husband, which they then used as their residence. Between the two homes, on lot 19, was a building known as the Vernon Glove Factory (factory). Kelsey and Nemeth formed a partnership to operate a business called the Vernon Glove Company (company) out of the factory.

On March 8, 1974, Kelsey divided lot 19 along the roof ridgeline of the factory. He quitclaimed the eastern part to Nemeth, with certain conditions.[2] On the same day, March 8, 1974, Kelsey executed a will by which he left his partnership interests in the company to Nemeth, also with conditions.[3] He left lot 15, as well as the residue and remainder of his estate, to Hull and Warner.[4]

Three years later, on March 14, 1977, Nemeth quit-

claimed lot 19 east back to Kelsey so that they could remove the conditions on the original deed; Kelsey immediately quitclaimed lot 19 east back to Nemeth, without conditions. Shortly thereafter, on May 23, 1977, Kelsey died. On June 23, 1977, the Branford Probate Court admitted Kelsey's will and appointed Attorney Frank J. Dumark as executor. Dumark initially issued two certificates of title, stating an opinion that Nemeth had owned both lot 19 west and lot 19 east. Later, however, he included lot 19 west as part of Kelsey's estate.

Years later, Dumark's administration account was filed; it did not propose distribution for any of the real property in Kelsey's estate. On February 11, 1981, the Branford Probate Court issued an order stating that there were other assets to be had that would be in the best interests of the beneficiaries of the estate and that the administration account would not be accepted as a final account but, instead, would remain an interim account. Dumark never closed the estate, and it remained open for twenty-five years.

From the time Opie purchased lot 15 until some point in 2003, he believed that Nemeth owned all of lot 19. In 2003, however, Opie had his property surveyed in preparation for the construction of a deck. The surveyor advised him that nothing existed in the land records to prove Nemeth's ownership of lot 19 west. Opie then hired Church to investigate; Church discovered that lot 19 west remained in Kelsey's open estate and opined that it should have been devised to Hull and Warner as part of the residue of Kelsey's estate. Church drafted a quitclaim deed for Warner to sign that conveyed to Opie whatever interests she may have had in lot 19 west. The signed deed was recorded on April 28, 2005, along with the survey.

On November 9, 2006, Nemeth died testate, leaving her home and interests in the company to the plaintiff.[5] On December 27, 2007, the executrix of Nemeth's estate requested that the Branford Probate Court issue a revised certificate of devise transferring to Nemeth, and thus to her estate, lot 19 west. On March 5, 2008, however, Church filed a motion for a hearing in the Branford Probate Court on behalf of Opie to determine who was entitled to lot 19 west. The motion argued that the Probate Court had never issued a certificate of devise, that Kelsey's estate remained open, that Warner and Hull had an interest in lot 19 west as residue of Kelsey's estate, and that Opie was Warner's successor in title.

The Branford Probate Court reviewed the archived record and discovered a certificate of devise for lot 19 west in favor of Nemeth. The court noted, however, that this certificate was not part of the official records and was not recorded on the Branford Land Records. Nevertheless, the court denied the request for a hearing

on the ground that the certificate demonstrated that the original Probate Court determined that Kelsey devised the property to Nemeth.

On July 23, 2008, Church appealed the denial of the hearing request to the Superior Court on behalf of both Opie and Warner. Concomitant with that appeal, Church filed a notice of lis pendens on July 25, 2008. On July 2, 2010, the trial court, *Hon. William L. Hadden, Jr.*, judge trial referee, remanded the case to the Branford Probate Court for "an evidentiary hearing . . . to determine who is entitled to a certificate of devise as to [lot 19 west]."

That hearing was held in the spring of 2011; the Branford Probate Court issued its decision on July 20, 2011. The court, having heard the evidence and reviewed the arguments de novo, concluded that lot 19 west belonged to the company and therefore that Kelsey intended to transfer his interests therein to Nemeth as a company asset. See footnote 3 of this opinion.

On August 17, 2011, Church appealed the July 20, 2011 decision to the Superior Court on behalf of Opie, Warner, and the successors in interest to Hull and her estate. Accordingly, a second notice of lis pendens was recorded on August 26, 2011. Pursuant to an agreement reached by the parties, on June 28, 2012, the appeal was withdrawn and releases of the notices of lis pendens were recorded. On April 1, 2013, the plaintiff commenced this action against the defendants for slander of title.

On June 3, 2015, Church filed a motion for summary judgment, as did Opie on August 6, 2015. In both motions, the defendants argued that the statute of limitations had passed and that the alleged conduct was absolutely privileged. The plaintiff objected to those motions on December 4, 2015; the court denied them in a written decision dated April 25, 2016. In its decision, the court recited the applicable law and stated that "[t]he court concludes that [there] are issues of fact which deny the granting of summary judgment."

On January 27, 2017, the defendants filed a joint motion to dismiss for lack of subject matter jurisdiction, to which the plaintiff objected. In that motion, the defendants raised substantively the same immunity argument set forth in their motions for summary judgment, but this time couched in terms of subject matter jurisdiction. On June 5, 2017, the court granted the motion to dismiss.[6] On June 23, 2017, the plaintiff appealed.

As a preliminary matter, we must clarify what is and what is not being challenged in this appeal. The original bases for the plaintiff's claims for slander of title as alleged in the operative complaint, the third amended complaint, dated February 11, 2015, are as follows: (1) the drafting of the June, 2003 survey, which was revised on December 6, 2004, and recorded on April 28, 2005;

(2) the drafting of the quitclaim deed, dated May 26, 2004, and the recording thereof on April 28, 2005; (3) the drafting of the first notice of lis pendens, dated July 23, 2008, and the recording thereof on July 25, 2008; (4) the drafting of the second notice of lis pendens, dated August 17, 2011, and the recording thereof on August 26, 2011; and (5) the prosecution of the Probate Court appeal proceedings, namely, the motion for a hearing, dated March 5, 2008, the first appeal, dated July 23, 2008, and the second appeal, dated August 17, 2011. On appeal, the plaintiff asserts that her slander of title claims are founded only on the drafting and recording of the deed and survey, and that she briefed her appeal accordingly.[7]

Consequently, the plaintiff's claims on appeal, properly stated, are that the trial court erred by (1) improperly granting the motion to dismiss for lack of subject matter jurisdiction on the ground that the preparation and recording of the deed and survey were absolutely privileged[8] and (2) failing to apply the law of the case doctrine to bar the defendants from arguing anew that the preparation and recording of the deed and survey were absolutely privileged in their motion to dismiss. The defendants challenge these arguments; further, as an alternative ground on which to affirm the judgment, the defendants contend that the statute of limitations bars the plaintiff's claim. Because we agree with the defendants that the statute of limitations applies to bar the plaintiff's claims for slander of title insofar as they were founded upon the deed and survey, and because the plaintiff challenges only those actions on appeal, we conclude that the defendants were entitled to summary judgment and, accordingly, do not reach the other claims.

I

First, we must determine whether the trial court had subject matter jurisdiction over the plaintiff's claims with respect to the deed and survey. We do so even though the motion to dismiss was filed subsequent to the motion for summary judgment because "[s]ubject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction." (Internal quotation marks omitted.) *Fountain Pointe, LLC* v. *Calpitano*, 144 Conn. App. 624, 648, 76 A.3d 636, cert. denied, 310 Conn. 928, 78 A.3d 147 (2013). Specifically, in this case, we must determine whether (1) the plaintiff has standing and (2) the recording of the deed and survey were "communications uttered or published in the course of judicial proceedings" such that they "are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Petyan v. Ellis*, 200 Conn. 243, 245–46, 510 A.2d 1337

(1986).

"In an appeal from the granting of a motion to dismiss on the ground of subject matter jurisdiction, this court's review is plenary. A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Stones Trail, LLC* v. *Weston*, 174 Conn. App. 715, 735, 166 A.3d 832, cert. denied, 327 Conn. 926, 171 A.3d 59 (2017).

A

The defendants contend that the plaintiff lacks standing because she "did not have any interest in or title to [lot 19 west] until after title was determined at the conclusion of the appeal from the decision of the Probate Court dated July 20, 2011, and the issuance of the only valid [c]ertificate of [d]evise from the [e]state of Howard Kelsey to Elsie Nemeth on July 17, 2012." We disagree.

It is well established that "[a] party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . [T]he court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear. . . . Where a party is found to lack standing, the court is consequently without subject matter jurisdiction to determine the cause. . . . Our review of the question of [a] plaintiff's standing is plenary." (Citation omitted; internal quotation marks omitted.) *Fountain Pointe, LLC* v. *Calpitano*, supra, 144 Conn. App. 644.

The defendants' standing argument misconstrues the law. First, "[a]ny kind of legally protected interest in land . . . may be disparaged if the interest is transferable and therefore salable or otherwise capable of profitable disposal. It may be real or personal, corporal or incorporeal, in possession or reversion. It may be protected either by legal or equitable proceedings and may be vested or inchoate. It may be a mortgage, lease, easement, reversion or remainder, whether vested or contingent, in land or chattels, a trust or other equitable interest. . . . This does not purport to be a complete catalogue of legally protected interests in land . . . capable of disparagement. There may be other interests recognized by the law of property that are salable or otherwise capable of profitable disposal and to which the rule stated in this Section is therefore applicable."

Restatement (Second) of Property, § 624, comment (d), p. 344 (1977); see also W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) §128, pp. 965–66.

Thus, although "[n]othing vests by reason of [a will] during the life of the testator"; (emphasis omitted; internal quotation marks omitted) *Zanoni* v. *Hudon*, 42 Conn. App. 70, 75, 678 A.2d 12 (1996), citing 79 Am. Jur. 2d, Wills, § 7 (1975); the law giving rise to the tort of slander of title clearly contemplates a wider range of "interests" sufficiently cognizable to confer standing. Moreover, although it is true that a certificate of devise merely perfects an extant title, Nemeth took title, albeit contested, imperfect and not absolute, in lot 19 west immediately upon Kelsey's demise. See *Cardillo* v. *Cardillo*, 27 Conn. App. 208, 212, 605 A.2d 576 (1992) ("It is fundamental jurisprudence that title to real estate vests immediately at death in a deceased's heirs, or in devisees upon the admission of the will to probate. . . . The recording of a probate certificate of devise or descent is necessary only to perfect marketable title. That certificate furnishes evidence that the heir's or devisee's title is no longer in danger of being cut off by a probate sale to pay debts of the estate and also because it furnishes a record of who received the title. Such a probate certificate is not a muniment of title, however, but merely a guide or pointer for clarification of the record." [Citations omitted.]). The plaintiff also produced evidence of a potential sale and the trouble she had in effecting the same. Thus, construing the evidence in the light most favorable to the plaintiff, as we must; see generally *Padawer* v. *Yur*, 142 Conn. App. 812, 818, 66 A.3d 931, cert. denied, 310 Conn. 927, 78 A.3d 145 (2013); Nemeth had a salable interest in lot 19 west that was adversely affected by the preparation and recording of the deed and survey, as did her specific devisee, the plaintiff.

B

Having concluded that the plaintiff had standing to bring the slander of title claims, we must determine whether the preparation and recording of the deed and survey, the only activities challenged here, were absolutely privileged[9] such that the court lacked subject matter jurisdiction. See *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 723, 161 A.3d 630 (2017) ("absolute immunity implicates the trial court's subject matter jurisdiction"). We conclude that the defendants' actions were not absolutely privileged.

"As the doctrine of absolute immunity concerns a court's subject matter jurisdiction . . . we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . The question before us is whether the facts as alleged in the pleadings, viewed in the light most favor-

able to the plaintiff, are sufficient to survive dismissal on the grounds of absolute immunity. . . .

"Connecticut has long recognized the litigation privilege . . . [and has extended it] to judges, counsel and witnesses participating in judicial proceedings. . . . In *Simms* [v. *Seaman*, 308 Conn. 523, 531, 69 A.3d 880 (2013), our Supreme Court] noted that the doctrine of absolute immunity originated in response to the need to bar persons accused of crimes from suing their accusers for defamation. . . . The doctrine then developed to encompass and bar defamation claims against all participants in judicial proceedings, including judges, attorneys, parties, and witnesses. . . . [Our Supreme Court] further noted that, [l]ike other jurisdictions, Connecticut has long recognized the litigation privilege, and that [t]he general rule is that defamatory words spoken upon an occasion absolutely privileged, though spoken falsely, knowingly, and with express malice, impose no liability for damages recoverable in an action in slander . . . .

"Furthermore, in *Rioux* v. *Barry*, [283 Conn. 338, 343–44, 927 A.2d 304 (2007), our Supreme Court] explained that [t]he purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . [T]he possibility of incurring the costs and inconvenience associated with defending a [retaliatory] suit might well deter a citizen with a legitimate grievance from filing a complaint. . . . Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine [of absolute immunity] was intended to protect nevertheless faced the threat of suit. . . .

"In *Simms* v. *Seaman*, supra, 308 Conn. 540–45, [our Supreme Court] further discussed the expansion of absolute immunity to bar retaliatory civil actions beyond claims of defamation. For example, we have concluded that absolute immunity bars claims of intentional interference with contractual or beneficial relations arising from statements made during a civil action. See *Rioux* v. *Barry*, supra, 283 Conn. 350–51 (absolute immunity applies to intentional interference with contractual relations because that tort comparatively is more like defamation than vexatious litigation). We have also precluded claims of intentional infliction of emotional distress arising from statements made during judicial proceedings on the basis of absolute immunity. See *DeLaurentis* v. *New Haven*, 220 Conn. 225, 263–64, 597 A.2d 807 (1991). Finally, we have most recently applied absolute immunity to bar retaliatory claims of

fraud against attorneys for their actions during litigation. See *Simms* v. *Seaman*, supra, 545–46. In reviewing these cases, it becomes clear that, in expanding the doctrine of absolute immunity to bar claims beyond defamation, this court has sought to ensure that the conduct that absolute immunity is intended to protect, namely, participation and candor in judicial proceedings, remains protected regardless of the particular tort alleged in response to the words used during participation in the judicial process. Indeed, we recently noted that [c]ommentators have observed that, because the privilege protects the communication, the nature of the theory [on which the challenge is based] is irrelevant. . . .

"It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged [as] long as they are in some way pertinent to the subject of the controversy. . . . As to the relevance of the statements or documents produced . . . we note that our law provides for a very generous test for relevance." (Citations omitted; internal quotation marks omitted.) *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 724–27.

In this case, the defendants contend that the preparation and recording of the deed and survey are privileged because the deed was prepared and recorded for the express purpose of conferring standing on Opie to bring his claim in the Probate Court, and the survey was prepared and recorded because it was referenced in the deed. The plaintiff, conversely, argues that the preparation and recording of the deed and survey are (1) too remote in time from the probate action to be related thereto and (2) too dissimilar in nature to the kinds of statements the doctrine of absolute immunity was meant to protect to be privileged. We agree with the plaintiff.

The actions the court specifically addressed in granting the defendants' motion to dismiss were the preparation and recording of the two notices of lis pendens. These actions are immune in part due to statutory imprimatur. See General Statutes § 52-325. Moreover, they necessarily are relevant to specific litigation because they must give notice of "actions intended to affect real property." See General Statutes § 52-325 (b). Additionally, the notices of lis pendens necessarily identified in their text the specific legal actions to which they were related.

The actions challenged in this appeal, however, are entirely different and do not square with the purpose for the privilege. First, the defendants failed to obtain a deed from both of Kelsey's daughters, suggesting that they were less concerned about actually obtaining title than with challenging the plaintiff's title. Second, the defendants' actions were undertaken some five years prior to the bringing of the probate action. Although

this does not, in and of itself, exclude the preparation and recording of the deed and survey from the purview of the privilege, the remoteness in time does bear on the legitimacy of the connection between the actions and the judicial proceedings. The defendants' failure within several years to initiate any legal action once they had obtained what they concluded was sufficient standing undermines their arguments. More problematic is the notion that the deed and survey were recorded for the purpose of obtaining standing for some nebulous action that had yet to coalesce until the apparent owner had died.[10]

Second, the actions at issue are different in nature because although our statutes expressly permit the use of notices of lis pendens in the manner they were used here, our statutes specifically discourage the abuse of the land records for purposes of slandering title. See General Statutes § 47-33j.[11] Given the defendants' admissions that the purpose of the deed and survey was to confer on Opie the ability to call into legal question the validity of Nemeth's title whenever he so chose to do so, i.e., after she died, these actions are distinct from the preparation and recording of the notices of lis pendens related to a specific judicial proceeding. Although the test for relevance is very generous, we must balance it against the requirement to construe the evidence in the light most favorable to jurisdiction. When we do so, this case falls outside the limits of legal generosity, and the plaintiff has colorable claims for slander of title.

Therefore, weighing the evidence in the light most favorable to jurisdiction, we conclude that the defendants' actions and statements in preparing and recording the deed and survey were not absolutely privileged. Therefore, the trial court had subject matter jurisdiction over this case.

II

Next, we turn to the defendants' alternative ground to affirm that, even if their actions were not absolutely privileged, the court should have granted their motions for summary judgment because the plaintiff's claims were time barred. We conclude that this alternative ground is properly before this court and agree with the defendants that they were entitled to summary judgment.

A

First, we must consider whether we may properly address the alternative ground at all. Practice Book § 63-4 (a) (1) provides in relevant part: "If any appellee wishes to . . . (A) present for review alternative grounds upon which the judgment may be affirmed . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues. Whenever the failure to identify an issue in a preliminary statement

of issues prejudices an opposing party, the court may refuse to consider such issue." Nevertheless, even where an alternative ground on which to affirm has been identified in a § 63-4 (a) (1) statement, in most cases,[12] "[t]he appellee's right to file [such] statement has not eliminated the duty to have raised the issue in the trial court . . . ." (Internal quotation marks omitted.) *Thomas* v. *West Haven*, 249 Conn. 385, 390 n.11, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000).

In this case, the defendants properly filed § 63-4 (a) (1) statements identifying the alternative ground at issue. Counsel for Opie conceded at oral argument before this court, however, that the defendants did not file a cross appeal to challenge the trial court's denial of their motions for summary judgment.[13] Nevertheless, all parties had ample opportunity to address the underlying legal issues because they were raised repeatedly in briefing and argument before the trial court and this court. See *DeBeradinis* v. *Zoning Commission*, 228 Conn. 187, 198, n.7, 635 A.2d 1220 (1994). Accordingly, we conclude that we may address the alternative ground on which to affirm without prejudice to the plaintiff.

B

We turn therefore to the legal principles governing the defendants' claim. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to [deny] the defendant's motion for summary judgment is plenary. . . .

"Public policy generally supports the limitation of a cause of action in order to grant some degree of certainty to litigants. . . . The purpose of [a] statute of limitation . . . is . . . to (1) prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability, and (2) to aid in the search for truth that may be impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. . . .

Therefore, when a statute includes no express statute of limitations, we should not simply assume that there is no limitation period. Instead, we borrow the most suitable statute of limitations on the basis of the nature of the cause of action or of the right sued upon." (Citations omitted; internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 198–99, 931 A.2d 916 (2007).

1

The issue of which limitations period applies to a slander of title claim is an issue of first impression and a question of law over which our review is plenary. See *Vaccaro* v. *Shell Beach Condominium, Inc.*, 169 Conn. App. 21, 29, 148 A.3d 1123 (2016), cert. denied, 324 Conn. 917, 154 A.3d 1008 (2017). Slander of title is foremost a creature of the common law but also is referenced in the Marketable Title Act, General Statutes § 47-33b et seq. See footnote 11 of this opinion. Section 47-33j, however, does not include a specific limitations period, so we must "borrow the most suitable statute of limitations on the basis of the nature of the cause of action . . . ." *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 284 Conn. 199. The defendants argue that General Statutes § 52-597[14] or, in the alternative, General Statutes § 52-577[15] should apply to bar the plaintiff's action. Although the plaintiff disagrees, she does not offer any alternative statute. We conclude that § 52-577 provides the appropriate limitations period.

The tort of slander of title is defined as "the uttering or publication of a false statement derogatory to the plaintiff's title, with malice, causing special damages as a result of diminished value of the plaintiff's property in the eyes of third parties. The publication must be false, and the plaintiff must have an estate or interest in the property slandered. Pecuniary damages must be shown in order to prevail on such a claim." (Internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 669–70, 778 A.2d 237 (2001), quoting 50 Am. Jur. 2d, Libel and Slander § 554 (1995); see also *CHFA-Small Properties, Inc.* v. *Hussein Elazazy*, 157 Conn. App. 1, 18, 116 A.3d 814 (2015); *Fountain Pointe, LLC* v. *Calpitano*, supra, 144 Conn. App. 653–55; *Gilbert* v. *Beaver Dam Association of Stratford, Inc.*, 85 Conn. App. 663, 672–73, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

In dicta[16] in *Bellemare*, our Supreme Court analogized the claim in that case, a violation of General Statutes § 49-8,[17] to a slander of title claim in determining that the three year limitation on tort claims applied. Specifically, the court noted: "Slander of title is a *tort* whereby the plaintiff's claim of title [to] land or other property is disparaged by a letter, caveat, mortgage, lien or some other written instrument . . . . A cause of action for slander of title consists of any false communication

which results in harm to interests of another having pecuniary value . . . . Such an action lies in tort and is akin to an action for damages pursuant to § 49-8." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 284 Conn. 202.

Although dicta, this discussion of § 52-577 in connection with slander of title claims counsels in favor of applying the three year limitations period. See W. Keeton, supra, § 128, p. 963 ("Because of the unfortunate association with 'slander,' a supposed analogy to defamation has hung over the tort like a fog, and has had great influence upon its development. On the other hand, the action seems to have been recognized from the beginning as only loosely allied to defamation, and to be rather an action on the case for the special damage resulting from the defendant's interference." [Footnote omitted.])[18]

2

Having concluded that § 52-577 applies, we next must determine the point at which the three year limitations period began to run. The plaintiff argues, essentially, that (1) as a matter of law, the statute of limitations does not begin to run until the defendants ceased to assert their claims against the plaintiff, and (2) in the alternative, the "continuing course of conduct" doctrine applies such that the limitations period does not begin to run until the cessation of all the conduct complained of, up to and including the second probate appeal and associated lis pendens. We disagree.

The plaintiff first suggests that, as a matter of law, the limitations period commences only after the defendants ceased to assert their claims against her. In support of her argument, the plaintiff cites to a single case from the United States District Court for the Western District of Virginia, *Warren* v. *Bank of Marion*, 618 F. Supp. 317, 322 (W.D. Va. 1985) ("[u]nder the rule here adopted, this cause of action did not fully accrue and the limitations period did not begin to run until the defendants released their claim against [the plaintiff's] property"). She urges us to adopt its analysis. We decline to do so.

We note that other jurisdictions have considered this question with differing conclusions. In some jurisdictions, the statute of limitations begins to run from the time of the act complained of. See, e.g., *Hosey* v. *Central Bank of Birmingham, Inc.*, 528 So. 2d 843, 844 (Ala. 1988); *Old Plantation Corp.* v. *Maule Industries, Inc.*, 68 So. 2d 180, 182–83 (Fla. 1953); *Boaz* v. *Latson*, 260 Ga. App. 752, 759, 580 S.E.2d 572 (2003), rev'd in part on other grounds, 278 Ga. 113, 598 S.E.2d 485 (2004); *Walley* v. *Hunt*, 212 Miss. 294, 309, 54 So. 2d 393 (1951); *Pro Golf Mfg., Inc.* v. *Tribune Review Newspaper Co.*, 570 Pa. 242, 247, 809 A.2d 243 (2002). In other jurisdictions, the limitations period begins to run when the

plaintiff reasonably could be expected to discover the existence of a claim. See, e.g., *Stalberg* v. *Western Title Ins. Co.*, 230 Cal. App. 3d 1223, 1230, 282 Cal. Rptr. 43 (1991); *LaBarge* v. *Concordia*, 23 Kan. App. 2d 8, 18, 927 P.2d 487 (1996). In still others, the limitations period begins to run upon pecuniary loss. See, e.g., *State* v. *Mabery Ranch, Co., LLC*, 216 Ariz. 233, 249, 165 P.3d 211 (Az. App. 2007); *Rosenbaum* v. *New York*, 8 N.Y.3d 1, 12, 861 N.E.2d 43, 828 N.Y.S.2d 228 (2006); *Ellis* v. *Waldrop*, 656 S.W.2d 902, 904–905 (Tex. 1983); *Valley Colour* v. *Beuchert Builders, Inc.*, 944 P.2d 361, 364 (Utah 1997). Finally, in some jurisdictions, the limitations period begins to run only after the defendant ceases to maintain the adverse claim. See, e.g., *Green* v. *Chamberlain*, 60 So. 2d 120, 124 (La. App. 1952); *New England Oil & Pipe Line Co.* v. *Rogers*, 154 Okla. 285, 7 P.2d 638 (Okla. 1931); *Chesboro* v. *Powers*, 78 Mich. 472, 479, 44 N.W. 290 (1889); *Nolan* v. *Kolar*, 629 S.W.2d 661, 663 (Mo. App. 1982).

The jurisprudence of this state's appellate courts, however, consistently has endorsed the theory that the relevant limitations period begins to run at the occurrence of the act complained of. "This court has determined that [§] 52-577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs. . . . Moreover, our Supreme Court has stated that [i]n construing our general tort statute of limitations . . . § 52-577, which allows an action to be brought within three years from the date of the act or omission complained of, we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred. . . . The three year limitation period of § 52-577, therefore, begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." (Citation omitted; internal quotation marks omitted.) *Valentine* v. *LaBow*, 95 Conn. App. 436, 444, 897 A.2d 624, cert. denied, 280 Conn. 933, 909 A.2d 963 (2006); *PMG Land Associates, L.P.* v. *Harbour Landing Condominium Assn., Inc.*, 135 Conn. App. 710, 717–18, 42 A.3d 508 (2012). Indeed, "[§] 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and *in some cases will serve to bar an action before it accrues.*"[19] (Emphasis added; internal quotation marks omitted.) *Targonski* v. *Clebowicz*, 142 Conn. App. 97, 108, 63 A.3d 1001 (2013).

Closer to the specific legal questions at issue in this case, this court previously has determined that, in the context of an ineffective lis pendens, the § 52-577 limitations period begins to run when the lis pendens is rendered ineffective, not when it is released. See *PMG Land Associates, L.P.* v. *Harbour Landing Condominium Assn., Inc.*, 172 Conn. App. 688, 694–95, 161 A.3d 596,

cert. denied, 326 Conn. 911, 165 A.3d 1252 (2017). Although the deed and survey were never rendered "slanderous," that case applies with equal force to the legal instruments at issue in this case. Inasmuch as the plaintiff has alleged that the preparation and recording of the deed and survey were inherently "slanderous," the statute of limitations began to run, as a matter of law, upon the recording thereof on April 28, 2005.

The plaintiff, however, also implies that the equities demand that we recognize the defendants' actions to be a continuing course of conduct such that the limitations period was tolled until the release of the notices of lis pendens. We disagree.

"[I]n the context of a motion for summary judgment based on a statute of limitations special defense, a defendant typically meets its initial burden of showing the absence of a genuine issue of material fact by demonstrating that the action had commenced outside of the statutory limitation period. . . . When the plaintiff asserts that the limitations period has been tolled by an equitable exception to the statute of limitations, the burden normally shifts to the plaintiff to establish a disputed issue of material fact in avoidance of the statute. . . .

"In certain circumstances . . . we have recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations. Tolling does not enlarge the period in which to sue that is imposed by a statute of limitations, but it operates to suspend or interrupt its running while certain activity takes place. . . . Consistent with that notion, [w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed. . . .

"[I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong . . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . . A second requirement for the operation of the continuing course of conduct doctrine is that there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . . The doctrine of continuing course of conduct as used to

toll a statute of limitations is better suited to claims where the situation keeps evolving after the act complained of is complete . . . .

"In sum, [i]n deciding whether the trial court properly granted the defendant's motion for summary judgment, we must determine if there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty. . . . [I]f there is no genuine issue of material fact with respect to any one of the three prongs . . . summary judgment is appropriate." (Citations omitted; internal quotation marks omitted.) *Vaccaro* v. *Shell Beach Condominium, Inc.*, supra, 169 Conn. App. 44–45; see also *Targonski* v. *Clebowicz*, supra, 142 Conn. App. 108–109.

Opie's failure to withdraw the deed and survey was not a continuing breach of a continuing duty. First, there clearly was no special relationship between the parties in this case. Second, there was no "later wrongful conduct . . . related to a prior act." (Internal quotation marks omitted.) *Vaccaro* v. *Shell Beach Condominium, Inc.*, supra, 169 Conn. App. 44. Under similar circumstances, our appellate courts have concluded that the failure to rectify the existence of an injurious instrument on the land records is a single occurrence. See *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 284 Conn. 202–205 (failure to deliver release of mortgage lien not continuing course of conduct); *PMG Land Associates, L.P.* v. *Harbour Landing Condominium Assn., Inc.*, supra, 172 Conn. App. 695–98 (failure to release lis pendens not continuing course of conduct).

Accordingly, because the plaintiff does not challenge the dismissal of her claims insofar as they are not premised on the preparation and recording of the deed and survey, and because the recording thereof was a single occurrence completed some eight years before the commencement of the present action, her claims are untimely, and the trial court should have granted the defendants' motions for summary judgment.

### III

Finally, in light of our conclusions and under the unusual circumstances of this case, we briefly must determine what disposition is proper. In *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 729, we held that where a court concludes that certain conduct is absolutely privileged, it should dismiss claims premised on such conduct. Thus, the court here properly dismissed the plaintiff's claims with respect to the actions not challenged in this appeal, namely the preparation and recording of the two notices of lis pendens and the prosecution of the probate appeals. Although the preparation and recording of the deed and survey were not

privileged and thus do not implicate subject matter jurisdiction in the same way, the court should have granted summary judgment as to those claims because they were time barred.

The form of the judgment is improper, the judgment dismissing the action is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other judges concurred.

[1] Paul Gouin, the successor executor of the estate of Elsie Nemeth, was also a plaintiff at the trial court. All of Gouin's claims were dismissed, stricken, or abandoned. See *Chamerda* v. *Opie*, Superior Court, judicial district of New Haven, Docket No. CV-13-6037328-S (August 28, 2014) (58 Conn. L. Rptr. 865). He is not a participant in this appeal, and, therefore, we refer in this opinion to Chamerda as the plaintiff.

[2] Specifically, the deed provided that (1) "Nemeth shall not disturb [the company's] operation, claim rent, lease, sell said property or in any other way exercise ownership to the detriment of said [company]" and (2) in the event of either party's disposal of his or her interest in the company, "the buildings housing said [company] shall be razed within twelve . . . months of said happening at the expense of said [company] or sole ownership."

[3] Specifically, Kelsey's will provided: "I bequeath and devise all of my right, title and interest in [the company] and in and to all of the assets, real and personal, tangible and intangible owned by it, as shown by its books of account, to my partner, Elsie V. Nemeth, in fee; provided however that this gift shall be subject to all debts, obligations and claims of every sort outstanding against said [company] at the time of my death."

[4] Specifically, Kelsey's will provided: "To my daughters, Beatrice K. Hull and Ruth K. Warner, per stirpes, as tenants in common, I devise in fee my residence located on the sought side of Buena Vista Road in Branford . . . commonly known as 15 Buena Vista Road . . . . All the rest, residue and remainder of the property which I may own . . . I bequeath and devise in equal shares to my daughter, Beatrice K. Hull and my daughter, Ruth K. Warner . . . ."

[5] Specifically, Nemeth's will provided: "To my niece, Kimberly Chamerda . . . I devise and bequeath the real property located at 19 Buena Vista Road, Branford . . . if owned by me at the time of my death."

[6] Specifically, in granting the motion to dismiss, the court stated in relevant part: "The undersigned concludes that the law of the case doctrine does not apply on th[ese] issues. Therefore, the prior ruling of the court, *Agati*, *J.*, that there were disputed issues of fact preventing the entry of judgment, is inapplicable to the present issue, whether the action is barred by the absolute immunity doctrine. Although there is no Connecticut Appellate Court case directly on point, other jurisdictions have considered and decided whether a notice of lis pendens is protected by the doctrine of absolute immunity. At one point, a majority of jurisdictions concluded that absolute immunity applies. . . . However, recently, the trend appears to be that qualified immunity applies. Because none of the indicia that must be present to preclude the application of the doctrine of qualified immunity and because there is persuasive Superior Court authority which suggests that the filing of a lis pendens is absolutely privileged, this court grants the motion to dismiss."

The defendants filed a subsequent motion for articulation to clarify whether the court dismissed the case in full. The court granted that motion, noting that "[i]t was the intention of the [court] to dismiss the entire case. The coding, as judgment in part, was erroneous." Although it is unclear from this record, the granting in full of the motion to dismiss suggests that the court agreed that the defendants' actions with respect to the deed and survey were privileged.

[7] Indeed, the plaintiff states in her appellate brief that "[w]hether or not the certificates of lis pendens are barred by the doctrine of absolute immunity has no bearing whatsoever as to whether there is subject matter jurisdiction for the [p]laintiff's slander of title claims arising from the wrongful preparation and recording of the [d]eed and [s]urvey as alleged by the [p]laintiff in the [t]hird [a]mended [c]omplaint." Later, she states that "the preparation and recording of the [d]eed and [s]urvey . . . are the factual basis of the [p]laintiff's slander of title claims." This mirrors her apparent concessions before the trial court that the notices of lis pendens are absolutely privileged.

[8] At common law, "communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, 200 Conn. 243, 245–46, 510 A.2d 1337 (1986); see also *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 719 n.2, 161 A.3d 630 (2017) (discussing distinctions between terms "absolute immunity," "absolute privilege," and "litigation privilege").

[9] We note that the court concluded that the preparation and recording of the notices of lis pendens were entitled to qualified immunity. We read *Simms* v. *Seaman*, 308 Conn. 523, 569 n.30, 69 A.3d 880 (2013), as a rejection of the doctrine of qualified immunity. Accordingly, we analyze the defendants' claims in terms of absolute immunity.

[10] Arguably, with the evidence at his disposal, Opie already may have had sufficient standing to bring a quiet title action. See, e.g., *Fountain Pointe, LLC* v. *Calpitano*, supra, 144 Conn. App. 644–45 ("An action to quiet title 'may be brought by any person claiming title to, or any interest in, real or personal property, or both,' against any person who may 'claim to own the property, or any part of it, or to have any estate in it . . . adverse to the plaintiff, or against any person in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest, for the purpose of determining such adverse estate, interest or claim, and to clear up all doubts and disputes and to quiet and settle the title to the property. . . .' General Statutes § 47-31 (a). Furthermore, § 47-31 (a) provides: 'Such action may be brought whether or not the plaintiff is entitled to the immediate or exclusive possession of the property.' Thus, under § 47-31, any person having *any* interest in real property that is affected by a mortgage, the validity of which is being challenged, may bring an action to quiet title and seek to have the court declare the mortgage invalid." [Emphasis in original.]).

[11] General Statutes § 47-33j provides: "No person may use the privilege of recording notices under sections 47-33f and 47-33g for the purpose of slandering the title to land. In any action brought for the purpose of quieting title to land, if the court finds that any person has recorded a claim for that purpose only, the court shall award the plaintiff all the costs of the action, including such attorneys' fees as the court may allow to the plaintiff, and in addition, shall decree that the defendant asserting the claim shall pay to the plaintiff all damages the plaintiff may have sustained as the result of such notice of claim having been so recorded."

[12] But see *Blumberg Associates. Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 164, 84 A.3d 840 (2014) ("[t]reatment of [unpreserved, alternative grounds for affirmance] claims depends on three variables: (1) whether the claim was raised in the trial court; (2) whether the claim was raised on appeal; and (3) whether the appellant would be entitled to a directed judgment if it prevailed on the claim that it raised on appeal, or whether, instead, there would be further proceedings in the trial court").

[13] See *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005) ("the trial court's partial denial of the defendants' motion for summary judgment, which had been filed on the basis of [a] colorable claim of absolute immunity, constitutes an appealable final judgment").

[14] General Statutes § 52-597 provides: "No action for libel or slander shall be brought but within two years from the date of the act complained of."

[15] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[16] This court explicitly has held that our Supreme Court's discussion of slander of title in *Bellemare* was dicta insofar as it purportedly created a new element of the tort. See *Fountain Point, LLC* v. *Calpitano*, supra, 144 Conn. App. 654–55 ("The court's discussion of slander of title analogized the similarities between an action for damages under § 49-8 with the common-law tort of slander of title in order to bolster its holding that the three year tort statute of limitations was applicable. . . . We do not consider our Supreme Court's discussion of slander of title in *Bellemare* to have intended to lay down in positive form an additional element to a statutory slander of title cause of action." [Citation omitted; internal quotation marks omitted.]).

[17] General Statutes § 49-8 governs the release of satisfied or partially satisfied mortgages, ineffective attachments, lis pendens or liens.

[18] But see 50 Am. Jur. 2d, Libel and Slander § 529 ("In the absence of a statute expressly referring to actions for slander of title, the statute of limitations applicable to actions for libel and slander often applies to actions

for slander of title. Slander of title claims, however, may be governed by the limitation period for an action for an injury to the rights of the plaintiff, not arising on contract and not otherwise enumerated, or by a general statute of limitations for actions with no prescribed limitations." [Footnotes omitted.]).

[19] For this reason, we also reject the plaintiff's argument that the limitations period should not have begun until she had actual notice of the filing of the deed and survey. Also, as discussed previously, our appellate courts have rejected the "discovery" theory for accrual adopted by other jurisdictions. See part II B 1 of this opinion.